Good afternoon, please be seated. We're here for the bank argument in Lopez-Valenzuela v. County of Maricopa. Counsel ready? You may proceed. Good afternoon and may it please the Court, Cecilia Wong for the appellants. I would like to reserve seven minutes for rebuttal. Proposition 100 violates due process for four principal reasons. First, it deprives criminal defendants of an individualized determination of flight risk. You sent us a supplemental citation. That's right, Your Honor. Okay, you will let us know when this becomes valid. I will, sir. Thank you, Your Honor. First, Proposition 100 violates due process because it deprives criminal defendants of an individualized assessment of flight risk without any showing of a problem, much less the extreme measure of a categorical prohibition was needed. Why is that a problem? I'm sorry? Why can't a state come up with a categorical class of crimes or suspects that it deems to be suitable for bail? For example, many states, I believe, perhaps all states, have class of crimes about non-bail-like murder, I believe, and some other highly violent crimes, right? It's actually exceptionally rare to find categorical bail prohibitions in state law. Most states, to be clear, the vast majority, actually provide for an affirmative right to bail, except in capital cases. And most of those states have construed the statutes to actually permit but not require bail in capital cases. So are you making a facial challenge or an as-applied challenge? We are bringing a facial challenge, Your Honor, because— Then why wouldn't you lose if there is a class of offenses for which bail may be denied to every member of the class? We contend that on the Supreme Court's test in Salerno, the deprivation of an individualized hearing on this record violates due process in every application. And therefore, we survive the Salerno test. But isn't there a hearing provided to anyone who requests one within seven days after their arrest? The hearing is merely on immigration status. The hearing does not provide any individualized assessment of whether that defendant is bailworthy. And that is the due process violation. And that is why Proposition 133 does not. Is it clear that in the Simpson-Segura hearing that a defendant cannot raise the claim that they're not a flight risk? That's right, Your Honor. That's absolutely clear. I can see it. It's simply irrelevant to the inquiry? That's right. The only questions before the court are whether the person has entered or remained in the United States illegally and whether there's proof evident or presumption great that the person has committed a Class I-IV felony or aggravated DUI. Is your position—you stressed, on this record, you don't think the provision can be sustained. Is it your position that, as a categorical matter, a criminal defendant always has the right to an individualized determination? Or is it just that the state hasn't come forward with a strong enough showing in this record? Your Honor, we're not asking this court to strike down all categorical prohibitions on bail. I want to be clear about that. Theoretically, a categorical prohibition on bail could pass muster, although there's reason to doubt in the case law. The reason I say, theoretically, yes, is that Salerno sets out the touchstones for when a restriction on bail is permissible. First, I would point out, in Salerno, we were not dealing with a categorical prohibition. It was simply a novel question about whether federal courts could deny bail based on dangerousness rather than flight risk. In addition, the Supreme Court in Salerno pointed out several hallmarks of why that statute passed muster. First of all, there were robust procedural protections. Indeed, there was a full-blown adversarial hearing on that defendant's bailworthiness. Second— I'm sorry, let me cut you off because I just want to be clear on your position. If the State had come forward with statistics showing, for example, that, I don't know, 90 percent of undocumented immigrants who were granted bail just never showed up for trial, are you saying that on that record perhaps the provision could have been sustained or that it wouldn't matter because as a matter of due process, every single defendant has a constitutional right to an individualized determination? No, Your Honor. Salerno sets out the guideposts. You not only need an empirical finding that there is a problem with flight risk for this category, but also that the remedy that this legislature chooses is narrowly tailored to address that remedy. And this Court, in the Nunez case that I just cited, as well as in Judge Kaczynski's opinion in United States v. Scott, explains why you need that empirical showing and you need the empirical showing that the remedy chosen by the legislature is narrowly tailored. Proposition 100 fails on both those counts. Suppose Salerno had been arrested for murder rather than racketeering and the jurisdiction categorically forbade bail to murderers. Would the result have been different in Salerno? Perhaps, Your Honor, but I think that that's not, that wasn't actually an issue. To be clear, if you look at American bail laws, it stands now and it has for centuries, the presumption is that people should be affirmatively entitled to bail, except in capital cases. As the law professor's amicus brief points out, a very small minority of states have extended categorical prohibitions to cases that involve life imprisonment or the death penalty, and in a few cases, to very serious violent felonies like murder, rape, or kidnapping or sexual assault. Proposition 100 is far, far afield from such a limited category. Those statutes deal with one aspect of bail, and that is dangerousness. Another aspect that virtually all jurisdictions take into account is flight risk. Why can't the state say, okay, we've got categorical, some categorical class in which you constitutionally may not be entitled to bail. We're now going to find categorically a class of suspects who we think are a flight risk. Not every one of them, but, you know, if they're here illegally, the border in Arizona is very close. Depending on where you are in Arizona, it could be right across the street, right? From someplace like Tucson, it's not very far at all, right? Well, I would have two responses to that, Judge Kaczynski. The first is that the longstanding tradition that's clearly stated in Salerno, in Stack, in this court's decision in Galen, is that where flight risk is the asserted government interest. Bail must be set at an amount that is adequate to address that flight risk and not more. Proposition 100 is a drastic departure from that fundamental constitutional principle. But is this a question that Salerno left open? I'm looking at 107 Supreme Court at page, I believe it's 2105, in which they say, we need not decide today whether the excessive bail clause speaks at all to Congress's power to define the classes of criminal arrestees who shall be admitted to bail. So Salerno doesn't really get you as far as you want us to go, does it? But Salerno reinforces the Eighth Amendment principle, and more important for this purpose, it sets out the due process test, which Proposition 100 fails on every count. But if the court acknowledged that there might be a class of cases that a legislature could categorically restrict bail without violating the Eighth Amendment, how does that support your position? Because in this case, on this record, Arizona did not make the adequate showing, either that there was a problem of flight risk with undocumented immigrants or that this categorical bail. But surely, in terms of documenting the adequacy of flight risk, what more do you need than someone who is not in this ñ not a citizen of this country, is in here in violation of the immigration laws and is in a state contiguous to the state, to the country in which that person comes from? Isn't that enough? No, Judge O'Scanlan, it's not. The case has made clear that it's not. First of all, the second part is not so. This applies to any illegal ñ any undocumented person. That's right. Proposition 100 applies categorically to any undocumented immigrant. Even if they, like the person in Hernandez himself, who had lived there for a substantial time and had family, had in fact been granted, under the existing system, had been granted bail on his own recognizance, and it was only when he came into court, as he had been doing, that bail was revoked solely on the basis of his immigration status by the very court that had released him on bail because of the passage of Prop. 100. That's right, Judge Fischer. And let me make clear, the assumption about flight risk and undocumented immigrants is both factually incorrect on the record, and it is legally incorrect to rely upon it. Let me look at the record first. First, the record in front of the legislature was that Arizona courts were already considering defendants, including undocumented immigrants, and assessing their flight risk. And many undocumented immigrants, as Judge Fischer points out, were assessed not to be a flight risk, at least not to the extent they couldn't be released on bail or conditions. Those defendants were showing up for court as directed, but when Proposition 100 came down, they were immediately remanded into custody. That is, on its face, excessive. Secondly, Representative Pierce, who was the sponsor of Proposition 100, was actually challenged during a legislative hearing about whether he had any proof that undocumented immigrants categorically posed such a flight risk that the ban on bail was necessary. And the questioning representative pointed out that many immigrants in Arizona have longstanding residence in the state, stable ties to United States citizen family members, and may even own real property. Representative Pierce, the sponsor, did not respond. And finally, one point I want to make about the record before I turn it along is that there was not even anecdotal evidence. If you would infer from his silence, you would infer what? Not just from his silence, Judge Kaczynski, but the fact is that no one ever came forward with evidence to support the notion that undocumented immigrants posed a flight risk. Was there a press for admissions that basically said that? Do you have any evidence? No, we have no evidence. That's right, Your Honor. When we deposed the Maricopa County Attorney's Office and the Maricopa County Sheriff's Department, 30B6 witnesses, they said there was no data to show that undocumented immigrants posed a particular flight risk. What role does the fact that the people of Arizona passed what the legislature prepared play in our analysis of scienter and lack of evidence of buttressing what this was enacted for? Well, I think the Supreme Court cases and the Ninth Circuit cases direct the court to look both to the legislative record and to whatever the voters have in front of them that show what the intent was. On both those counts, there was clearly punitive intent. This is in the voter pamphlet? In the voter pamphlet, in the way that Proposition 100 was described to voters. And, again, there are very clear statements, consistent statements by the sponsor and supporters of Proposition 100 that the intent of the measure was to punish the perceived crime of being in the United States illegally and erroneous conclusion under Ninth Circuit and Supreme Court law and to end a perceived federal policy of catch and release. Exactly. Regarding conceptually, do you understand the Salerno which says first and second? It seems more sensible that they're cumulative. That's right. A way of determining whether it was punitive is to look both at what people said and also whether there's a match between what they did and their purported alternative reason. It's not quite worded that way, though. I think, Judge Berzon, that Salerno says that there are two separate stages to the inquiry, but I agree with you that the evidence showing that Proposition 100 was excessive bolsters the finding that there was express punitive intent. What do we do with the finding by the Arizona Court of Appeals in Hernandez v. Lynch and by United States District Judge Susan Bolton in this case in the order on summary judgment that you are appealing that that was not in fact the case, that the primary motivation was to address the risk of flight? Is that a factual finding to which we must defer unless we conclude it was clearly erroneous, or are you urging us to do a complete de novo review of the record? It is de novo review, Your Honor, and it is not a factual question. The reason I say that is we are here on a review of a grant of summary judgment, and moreover, the record is complete and the record is clear. Everyone, the courts and the parties, agree that the statements reflected express statements of punitive intent, and there were also unsupported mentions of flight risk as well. The legal question for this court is what is the conclusion you draw from those different assertions that were in the legislative record? And I think the answer is clear. Whether it's a primary intent question or a predominant intent question or something less than that that's not specified by Salerno, there was clear punitive intent. Let me ask you about that. It seems from the record you have evidence on both sides of this. So the standard does seem to make some difference, and to some degree this is akin to kind of a mixed motive situation where there's some argument for flight risk and then other statements related to national origin and illegal status being the reason. What do you think is the standard that we judge these by, and what do we look for to make that judgment? I think that at most the standard would be looking at the legislative record as a whole. What was the primary purpose of the legislation? It's not clear Salerno actually sets such a high bar, but I think on that test it's clear there's punitive intent. And the city of Indianapolis versus Edmond explains why, as a doctrinal matter, it would be a serious error to let an unsupported assertion of a legitimate interest effectively neutralize clear statements of impermissible governmental purpose. So you're really saying that we need to do these two pieces together, because unless you can assess the record support for the asserted legitimate reason, the other by itself might not carry the day. I actually think that the first test, the punitive intent test, would carry the day across. But it's a very difficult thing, getting to the heads, A, of some legislators, and B, of voters when you're dealing with an initiative. I think you're right, Judge Wilson. So it seems more sensible to feed in the question of whether the alternative is actually an alternative. You're right, Judge Wilson. I think that turning to the second test of whether the measure was excessive in relation to the asserted purpose helps to bolster the point that the true intent here was a punitive purpose. Does that prong also stand on its own, even if one were to fail the primary purpose test? Yes, Judge Fischer. Even if there were no statements of punitive intent on this record, Proposition 100 would still fail because it is excessive as a categorical prohibition. I do want to mention briefly. Can I go back, though? It leaves me with no answer, really, of how we evaluate this, because for the same reason we're cautioned against legislative history on other statutory interpretation, we have a little of this and a little of that. And a little of this definitely goes your way, and a little of that definitely goes the other way. So given you just have individual legislators, you don't have even a conference report or something akin to that, I'm not sure if it comes out in equipoise what kind of decision we can make as a matter of law. And, Judge McEwen, I don't think that the record is in equipoise, and here's how I'd answer your question about the standard for finding punitive intent. Well, assume it is in equipoise. Okay. I'll assume that. I think that's the question. I'll assume that for the moment. I think if the facts were in equipoise, I think that you look to see whether the asserted legitimate governmental purposes were supported by any empirical evidence. What we have are clear statements of punitive intent alongside unsubstantial. We don't require that of most legislation. If we required empirical evidence for most legislation, most of what Congress does wouldn't stand up. But, Judge Kaczynski, you have required it when fundamental liberty interests are at stake. The Nunez case that I've submitted to the Court clearly says, although the Constitution does not require the government to produce scientifically certain criteria of legislation, the government must still demonstrate that its classification is precisely tailored. And that is what proposition. That hardly sounds like asking for evidence. I mean, legislatures are not fact-finding bodies. They don't take evidence. I mean, they may have witnesses, but they call them witnesses, but they really are polemics. Very seldom do they have what we call hard evidence. There's certainly nothing that would stand up in court. I mean, there may be some stuff, but a lot of stuff comes in that would never get into an adventure hearing. So how do we look at this? I mean, we know in First Amendment cases the Supreme Court has told us we look for evidence. But that's the only area that I can remember where there's an actual statement of the Supreme Court that would look for evidence. Well, Judge Kaczynski, there are other areas other than the First Amendment. That's right. Voting rights. That's right. And in the Fourth Amendment context, Judge Kaczynski himself wrote an opinion in U.S. v. Scott, 450 F. 3rd and about 870, where the issue was whether pretrial releasees can be required as a blanket matter to weigh their right against a search without probable cause. And the particular search in that case was a drug test without probable cause. And Judge Kaczynski wrote, and I think you were right, that it might have appealed to common sense to say that a pretrial releasee who uses drugs might become so impaired that he wouldn't show up for court. But, you said, these are conceivable justifications, but the government has produced nothing to suggest these problems are common enough to justify intruding on the privacy rights of every single defendant out on pretrial release. Proposition 100 did just that. But that was not referring to what was produced in the legislature, which is what we're talking about. But there was a question was, do they come up with something now? And I thought we were talking about the question, does the legislature, do we look at the legislature if I can find evidence? It just seems like being like a – it does happen in a few other areas, voting, First Amendment, but it's very limited. And it's a very sort of dangerous thing to be expanding is to be asking legislatures to come up with evidence. I think DeMoore, didn't it, when it was reviewing the evidence in the no bail context, did in fact weigh heavily the findings of Congress that were generated by hearings and the narrow targeting that resulted. That's right, Your Honor. In DeMoore and in Salerno itself, the Supreme Court emphasized that Congress made a finding and then it tailored its remedy. But, Maura Alford, not only was there – I mean, a lot of the problem with evidence before legislatures, the legislature is not really an evidentiary body, but there's no evidence before us either. That is right, Judge Berzon. And that was the point I was going to make in response to Judge Kaczynski. To this day, the defendants have not put forward any evidence to support the notion. And I think it's important to remember that the baseline is that the record evidence was to the contrary. Again, the practice in courts – Ms. Long, what do we do with the testimony by the Maricopa County attorney before the House Legislative Committee, the Judiciary Committee in Arizona? And I quote, well, Arizona has a tremendous problem with illegal immigrants coming into the state, committing serious crimes, and then absconding and not facing trial for their crimes, either because they jump bail after they are let out or because when they are let out on bail, the federal government deports them. Is it your position that that's simply not a true statement? That's never happened? Or is it that it doesn't happen enough in your estimation? It's my position that the Maricopa County attorney's testimony was not supported by even anecdotal evidence. After he so testified, the only piece of data that he offered was the case where an undocumented immigrant was released on bail and the federal government deported the person. So that part of his statement is true? That part of the statement is true, but if that were the governmental interest, the legislature did not take the first step to address that problem, which would have been talking to the federal government. If they had, they would have found out there's a federal regulation that is already in place to deal with precisely that problem. And federal courts and state courts around this country have cited to that regulation to point out that the problem of a deportation of a state pretrial release is adequately addressed by simply communicating with the federal government. Was that the case where the alien came back and was involved in the murder of a Phoenix police officer? That's right. It was the absentee. So there is at least one case that supports the statement that the Maricopa County attorney made before the legislature? It only supported his statement that there have been cases where a person is out on bail and then is deported by the federal government. It does not support his statement that there were undocumented immigrants who were released on bail and fled. Well, clearly, if he had been retained in custody, he would never have been in a position to murder the police officer. But again, then the question is, is Proposition 100 narrowly tailored to address the problem posed by the tragic shooting of Mr. Atkinson? Isn't this, in some respects, a comparative problem? I mean, you can also come up with anecdotal evidence, I presume, of people who are not legal aliens and who flee the jurisdiction. That's right. And so the question is really whether this is an additional or different problem. Otherwise, we're going to keep everybody in great fraudulent detention because some people are going to flee.  Any category that the legislature would define. Can the legislature decide that some classes of suspects are more likely to flee than others? No, Your Honor, not without some empirical findings and without tailoring a remedy that addresses that problem. I would like to reserve the remainder of my time for rebuttal, if I may. Okay, thank you. We'll hear from the counsel. Thank you, Your Honor. Good afternoon, Your Honor, Your Honors. My name is Tim Casey. I represent the defendant's appellants in this case. May I please—appellates, excuse me—may I please the court in opposing counsel. Your Honor, Arizona has a legitimate and compelling interest to make sure that those people that are charged with committing serious crimes, felonies in Arizona, show up for their trial. And if they're convicted, serve their sentences. You have a very long tradition in this country, as well as the constitutional provision that directly addresses the fact that ordinarily people don't stay in jail pre-trial, even though every—I mean, many, many, many people have an impetus not to show up. Instead, we have—that's what bail is about. It's a way of trying to assure that they actually show up. You're absolutely right, Judge Rizzo. Am I saying your name correctly? Yeah, Burza. Burza. Go ahead. Judge, you're absolutely right. And you also mentioned something here about competing and balancing things. This is a balance. The legislature in Arizona, which is a citizen legislature, has made a determination that there are certain groups of individuals that it has determined, rightly or wrongly, Judge, that preceding grips that are not appropriate for bail, as the 50 other states—49 other states have done. Counsel, let me just stop you there, because I would be inclined to agree with you if I thought rational basis review applied here. Then I think you're right, that you could just say this isn't—it's not an irrational determination that the legislature or the people, I guess, of Arizona made. But don't you read Salerno and Fuchsia as requiring some kind of heightened scrutiny here? Yes, absolutely. And Salerno does require scrutiny. So don't—if you can see that, I don't see how you could possibly prevail on this record, because there is no evidence. I mean, the discussion is already illuminated. There's no evidence whatsoever of the kind of a tight fit between the means and the end. There has never been a requirement, either by this Court or by the Supreme Court, that any legislature, even our Federal legislature, has to come up with empirical data. Of course there has, in many instances. We just went over that before. There are instances, but there is absolutely no requirement. The Court in its decision in the three-judge panel, the majority decision, points out there is not a requirement. In Arizona, there is not a requirement. And not a requirement as to bail or not a requirement ever? As to the empirical evidence in making a determination. And I was thinking—I was trying to answer Judge Watford's question about this, that Salerno does require a heightened standard. And this meets the standard and ought to be affirmed, because what it is, is it's reasonably tailored to where the legislature determined that there was a perceived problem in the State of Arizona of people that had— Well, where is the reasonably tailored approach? The law was intentionally drafted very broadly. Yes. Two things, Your Honor. So what effort was made to carefully limit this law? I think two things. First and foremost is I believe—and I don't practice criminal law, so that's my disclosure there—but I believe there are six or seven classes of felonies. The first four classes were determined by the legislature to be only the ones that if you're also in the country unlawfully, that you would be subject to non-bail. So that was part of the reasonably narrowed prescription, if you will. The other element also is there is nothing particularly unusual on this record, in this case, about legislative bodies making determinations that either because of dangerousness or flight risk that certain people charged with a crime, not yet convicted, should not be bondable. I already heard here today some of the conversation about capital cases. You also have situations in which you have certain hands, sexual crimes, sexual assaults. Counsel, that's A1, that's 22A1. And that deals with a class of crimes. Yes. A4, that is the issue here, is a class of persons. That's very different. Two and three also deal with persons, but they're persons under very specific situations that will require an individual determination. So I know we've been using the language of narrowly tailored. This sounds like an equal protection problem, and I don't think there's an equal protection claim in this case. But there is a difference between the capital cases, which are, again, a category of crimes, and A1 or 22A4, which is a class of persons. But what justifies isolating a class of persons as a category? Judge Bybee, there is ‑‑ it is true that there is a classification of persons here, and that is people that are in the country undocumented, unlawfully. Can Arizona not conduct individualized hearings for them? Can they what? Is it impossible for Arizona to conduct individualized hearings for these people? No, of course not. And you conduct the Simpson-Segura hearings. Yeah, absolutely. And before this enactment of Proposition 100, there obviously were individualized determinations. And immigration status was a criterion. My understanding is it was. In presence and community, I think Judge Fisher pointed out, and I think you cited the Hernandez decision, which is the Arizona Court of Appeals found this to be constitutional, as did Judge Susan Bolton of the District Court found this constitutional, as did two judge members of this panel of lower court. Three courts have found this constitutional. And what they did is why we usually look at, in Salerno, the mafiosa that came ahead, while you normally are looking at crimes, we also can look at, in this particular instance, a class of person in terms of risk of life. For example, there was one email that indicated that this is being applied against people from Cuba who can't go back, cannot go to Cuba. There's nowhere they can go. But it's being applied anyway. Is that right? I'm sorry. I heard the Cuba part. It's being applied to people from Cuba who cannot go back to Cuba. Yes. So it's obviously not calibrated to people who have any, I mean, aside from the fact that there's no numbers or anything else. It also excludes tourists, right, who are just as likely to go back as illegal immigrants, aliens, right? Yes, Judge Kaczynski. If you're a tourist, presumably you're here on a tourist visa and you commit a crime, you're excluded. Or anybody who's a citizen of another country. Who is in our country. Here legally, but a citizen, a dual citizen, a citizen of another country. Any citizen of another country can go back. Can go back if they're in our country legally. Israel, Ireland, Romania. Yes, sir. No, no, no. No, yes. If you happen to be from Romania, Bulgaria, Czechoslovakia, you come over here, you commit a violent crime, but you're on a tourist visa, you're not subject. Or you came here in 1962 and are still a Romanian citizen. You can go back, you know. Your Honor, but I think I'd like to focus on the classification because I think that's really the heart of what Judge Biden is saying. Is we have a unique situation here. Is that the legislator determined that whether we agree with it or not, whether it's a capital offense. When you got, I think it was Mr. Pastrero Armenta who was kidnapping, violent crime. Whether it's him or whether you have something that even is traditionally not a custodial, is going to result in a custodial incarceration, if you will. The determination has been made that for justice to be done through the criminal justice system. Well, we have to have to make sure that the people are there. If they're here, then we can make sure they're there. But isn't that a justification for just detaining everybody without bail? But there is no constitutional right, either under the federal system or Arizona law, for bail. So, in other words, yes, your answer is yes. If the legislature decided that we have too many people who aren't showing up, everybody should be pretrial detained. Theoretically, under your hypothetical, a legislature could do that. I'm not arguing that they should do that. I don't think they should do that. But under that hypothetical, it is conceivable. What this court has to do, the legislature makes the policy decision. This court makes the constitutional decision under Salerno. And understandably, what we have is a unique classification of persons that have been deemed by the legislature as a flight risk. Can I ask you to address the irrebuttable presumption cases that are cited in Judge Fischer's dissent? Yeah. To me, I'll just put my cards on the table. To me, that's your real problem, is that that's what this Proposition 100, that's what it sets up, right? Yeah. In Judge Watford, what I see here is two things, if I can add. I will sincerely try to answer that question because I see it as two things. First, you've got that bail is not a fundamental constitutional right under the federal court and the Supreme Court decisions. Carlson Fernandez cited page 13 of our agreement. Then you have the historical information that we have in here about all the offenses where there is a denial of bail without a categorical determination. Because that's the issue you have here, some of the judges here, is there's not an individualized determination of bail for people. But it's done all the time, not only in capital offenses, but repeat felonies, crimes of violence, certain sexual crimes, drug offenses. Yes, but all of those require – you're reading down the list in 22A. And 22A.2 and 3 – I'm sorry, are you talking about – you said 22A. 22A.2 and .3 are types of crimes where we have a particular person. But you're going to have to have an individualized hearing to determine whether the person is already admitted to bail on a separate felony charge. That's two. Under Arizona law. Under Arizona law. Now I'm reading three felony offenses if the person charged poses a substantial danger to any other person or the community. That's going to demand an individualized hearing. Judge Leibman, what I was referring to is not under Arizona law, but collectively the 50 states that all do not allow individualized bail. But every example you gave was a definition of a crime that did not go to the flight risk question. Right. Yes, it went to – So what instances do you have historically or now in which a categorical determination of flight risk was made? I have an obligation to the Court. I have no empirical data because we do not have a statute. I'm not talking about empirical data now. I'm asking you what examples of statutes do you have that have made a categorical flight risk determination? Alabama, Arizona, and Missouri. On the same thing, but not on any other basis.  But not for any other reason. I couldn't tell you that, Judge. I'm sorry. I don't know. One other question. Yes, ma'am. In fact, the determination that's made here is not that they are illegal in the country. It's that there's probable cause that they're illegal in the country.   It's that there's probable cause that they're illegal in the country. Yes. The evidence driving this isn't being proven as such. Not until a Simpson-Zaguri hearing, which they have a right to in seven days. Even at the Zaguri hearing, all that's being proven is that there's probable cause. Is that right? That is right. Yes. Proof, evidence, presumption, great that the crime has been committed. No. But as to their illegal status, it's not that they are in fact illegal. That is correct. And moreover, they – whatever documentary evidence is being relied on, they can't see. They have the ability to present their independent evidence. But they can't see what the government's relying on. Yeah. And I think, you know, when you look at the underlying opinion, it's not because of any policy of my clients. It's because the data that my clients rely on is provided by the Federal Government. And for whatever reason, the Federal Government says that's proprietary. It cannot be shared. But there are many mistakes that can be made along this way. So in many instances, the person as to whom there might be probable cause that they're That's true. What is your position on the standard on these legislative statements that have now been tallied up by both sides? Yeah. I think Ms. Long is correct. It's de novo. It's what's the primary – well, we know it's de novo. But what's the primary – is it the primary purpose? Yeah. I think it is the primary purpose under the Salerno decision. I respectfully submit to you that the decisions – and I heard what you mentioned earlier, Judge McEwen, about there's some evidence here and evidence on this side that supports both. But I think if you look at the totality of the evidence, if you look at some of the comments made about people that are unlawfully in the country, this is in the 2005-2006 time period. And in the context, at least as I read those, Your Honor, those seem to be merely about context where there's a side comment about frustration over a perceived failure by the Federal Government to protect the Southern Arizona border. That's it. But it talks about the problem in which people who are charged with serious crimes being able to flee. And that is the flight risk concern. Right. But how do you – we have all those. So what do we do? We line them all up, all the ones on – which look to be a punitive, excluding aliens, some of which say basically being an alien ought to be the reason that you're kicked out. And do we line those up then with the various snippets on flight risk and put them in the old judicial blender and decide if it's primary or not? What's the substantive basis? Well, I think you have to focus on Salerno. And Salerno doesn't provide that level of specificity, Judge McKeown, about whether you can tally up one side of the paper or the other. I don't believe it does. Is there a punitive intent? I respectfully submit to you that there is not. And how do you benchmark a punitive intent when you have kind of a haphazard group of people on each side making statements? Well, let me put it this way, and I want to refer to the panel opinion below. I think Judge Bolton, even after the court below, indicated that there might be some things that reasonable minds can conclude were inappropriate, perhaps motivating, but she never made a finding that there was a motivating of a punitive factor. But it's de novo review. It's de novo review. Absolutely, this court is able to do whatever it believes is the law and correct. But I think what you have to do is, you know, the legislature is made up of numerous people, and I don't know why I didn't cite it, but there's a body of law that talks about relying on the statements of a few people, although Russell Pierce was the sponsor of a bill on a prominent member of the Arizona legislature at the time. But it's dangerous to rely on any one person and then projecting into why every legislator voted for it. But we also have another issue here, is that this thing was a representative-sponsored referendum that actually went to the voters of the people of Arizona. And it passed 78% to 22%. And I think Judge Bolton, who lives in the district, analyzed the law, and he's a conscientious judge, and said, put it well, is that, and I forget, one of the judges over here asked about what's the influence? It might have been Judge Smith. What's the effect of the fact that voters looked at this? Well, it has a softening effect, if you will, because you might have three or four legislatures, legislators commenting about their frustration with problems at the border, and then saying, we want to make sure that anyone here unlawfully charged with a crime is non-bondable. But you go send it out to the voters, and 78% of those people approve. Well, what about your opposing counsel's formulation, which, as I understand it, is these two pieces work together, i.e., we don't need to answer the entire question of whether it's punitive under either prong. We put the two together to make this. I disagree with Cecilia, and Ms. Wong. She's a very capable lawyer. Her argument is absolute. But I disagree. I think the first prong of Solerno, excuse me for the mental cramp there, but the first prong is you've got to establish whether or not there's that intent, that punitive intent. Then the second thing is whether it's rationally related to the legitimate and compelling interest of the State. I don't think you roll the two together about whether or not it's Solerno. Well, wait a minute. It certainly didn't say that. I mean, it might have said either or, but it certainly didn't say both. I'm sorry? It might have said either or, but it didn't say both independently. No. I think if you find punitive intent, as I read Solerno, if you find that as a primary, that is the reason. Or if you find excessiveness. Or you find excessiveness. Just to clarify, you don't need both of them. Okay. Now, but I think what you ultimately need to do respectfully is I'm looking at page 12 of the panel's decision. And this goes, Judge Brisson, to your – excuse me, Judge McKeown's question. Page 12, quote, reviewing the record, neither the legislative history nor the voter materials in media coverage would support the argument that Proposition 100 was motivated by a punitive rather than a regulatory purpose. Proposition 100 survives the first prong of the Solerno substance due process test. I believe the panel majority got it right on that. That's what you do instead of lining up, as Judge McKeown suggested, perhaps, you know, one side of the paper pros, the other side cons. What you're doing is you're evaluating the record, the legislative history, the voter materials, and the media coverage. And you have three different courts look at all of them and say constitutionally. Now, what we have here is we have a very emotional charged issue. Admittedly, we're dealing with a classification of people. And McKeown put it, I thought, ably. Because some people, demagogues or what, are criticizing a certain group of people that are out here unlawfully because it's politically expedient or popular or unpopular. But the fact of the matter is, is that if you're a victim of crime, the Arizona legislature has made a decision that if you're charged with a serious crime, we're going to hold you non-bondable. And it is no different than holding anyone, regardless of race, creed, ethnic origin, who's charged with a serious crime. Holding them non-bondable, it just happens to be there's a two-component here. Your nation of origin, unlawful status, and a serious crime. But for a serious crime, you're not being held. Except a serious crime encompasses a whole range of activity, some of which, like Mr. Hernandez, involve possessing a false Social Security card. Well, yes, absolutely. And I think one of the arguments that we kind of make, and my opposing counsel ably make, is, well, wait a second, this is going too far on class 4. So if the government, if Arizona decided that anybody who is a citizen of another country, including citizens, people who are legally citizens here, cannot get bond because they have means to go to another country, that would be okay? No, I don't agree with that. And I also suggest to you that when you look at some of the cases, because the legislature, whether or not we agree with whether they have empirical evidence or they don't have empirical evidence, there is plenty of record that was cited by a panel decision, including even Mr. Pierce, who's been often criticized, talking about flight risk under the hypothetical that I just heard. I'm talking about flight risk. I'm talking about flight risk. Somebody gets up and says, obviously people who are citizens of another country are higher flight risks because they can just walk into the other country, obviously. So, therefore, we don't need any data. We're just going to say this. Yes. The legislature has that ability. That gets back to the issue that was raised, I think, by Judge Watford, and that has to do with the standard of review. Yes. As he pointed out, if this were a rational basis, we probably wouldn't be having this conversation. Yes. But if it isn't a rational basis, then what is it? Salerno wasn't clear on that, was it? No, it wasn't. So what are we to do? What standard are we? Is it some type of heightened scrutiny? And if so, how would you define it? It is a heightened scrutiny. And, quite frankly, the panel decision determined that we had the State of Arizona had a legitimate compelling interest in making sure that those people charged with crimes who appear unlawfully were there for trial and served their time. So it is a heightened scrutiny. But is it an intermediate scrutiny where there's more balancing, or do we have strict scrutiny here of some kind where you've got to pick out the only way, basically, to satisfy the State's legitimate interest? Judge Smith, it is an intermediate. I respectfully submit to the Court. I believe it's an intermediate level. And the reason why is because when you go to the Supreme Court decisions in Carlson and Fernandez where bail is not a fundamental right, and then when you compare it with the 50 states that have made categorical denials of bail about individualized determinations, there is no fundamental right. And that's one of the things that we have to say. Is that really true, no fundamental right to bail? So the State, in your view, could say, no bail. No bail. If you're suspected of a crime and you meet whatever power of cause is necessary to effect an arrest, you sit there until you plead out or get acquitted. Or serve your sentence. Yeah, under the law, that's right. Because it's only when you allow or promote bail. There's a longstanding common law tradition, and particularly in this country, that you do get bail. I have a hard time accepting your answer that the legislature could do away with it constitutionally. For all crimes. For all people. I'm answering it hypothetically because I'm hypothetical. So the excessive bail clause is just a joke? I mean, it basically says you can't have too high a bail, you can have no bail for anything. No, I certainly don't consider that a joke at all. Why? You think it means that if you set bail, it's got to be reasonable. Yes. But no bail is okay. You don't get to bail out a law, that's okay. Under the, I mean, what I looked at under Carlson and Fernandez stands for that presumptive proposition, but as soon as you, and there is the common law tradition, we make bail available. And if you make it bailable, it has to be reasonable. It cannot be excessive. The Eighth Circuit has held definitively to the contrary, right? I'm sorry? The Eighth Circuit has held definitively to the contrary. It has. Let me ask you about the, there are two classes here, if you will. You've got a facial challenge and an as-applied challenge. Yes, sir. Do you believe, from Arizona's perspective, that one is a better claim against you than the other? And if so, why? No, I don't believe that either. I don't want to ask you a hard question. They're all terrible. No. The facial challenge is obviously the most difficult because under the law, if I could find my notes real quick. While you're looking at that, perhaps you might return to Judge Wofford's question about your rebuttable presumptions because I'm not sure you quite answered that one. So as I understand how the law works, it doesn't make any difference whether or not the State concedes that there's no flight risk. You go to the sentence of your hearing and the State, or the County says, we agree there's no flight risk. We stipulate to bail. The judge has no discretion. True? True. All right. So how does that fit in with the case law cited by Judge Fisher and referenced by Judge Wofford about the presumption against the disfavorment of irrebuttable presumptions? Yeah. It is clearly disfavored, and that's the decision that this Court, obviously in bond, has to make a determination. There's no question about that. But what we have here, what I'm trying to urge, obviously, the Court, is we have a compelling interest in making sure people that attend their trial and, if in fact are convicted, serve their time. So why isn't that solved by a rebuttable presumption rather than an irrebuttable presumption? You know, Your Honor, to be honest with you, without the impediment on arguing this, without a formal State record, and you mentioned a staff report, it's difficult for me to be able to answer that question. I don't have an answer for you. But isn't there an irrebuttable presumption in a category of cases such as murder cases where a person is held without bail, and it doesn't matter in those cases whether or not the person could show that they would otherwise be a good candidate for release on conditions? No. I mean, yes. I mean, Judge Holman, that's exactly the case. We have not only in Arizona, but in the 50 States, a whole host of categories where you have these irrebuttable presumptions. You could have people charged with various crimes. Right. Those go to the seriousness of the crimes. I take your point on that. But I just don't know of any other circumstance where we're talking about flight risk alone where we have this situation. No. And arguably, arguing the same issues that deal with dangerousness can also apply to flight risk, that most of the law is on dangerousness, whether it goes to Salerno and the Mafioso Kingpin or whatnot. But you are facing a unique set of laws here. As I mentioned, there are three states that have this, as I understand it, as of this moment. Does Arizona make the claim that undocumented aliens have to be held because they present a higher risk of dangerousness to the community? No, I'm not. So it's solely that they're a flight risk? It's solely that they're a flight risk. Yes, Your Honor. We did provide to the Court earlier that there was some. There's obviously, and this was reflected in the legislative discussion, a huge range of possibilities in that regard. I mean, there are people who were brought here as children and have been here for 50 years who don't know a soul of Mexico. Right? And you're still applying this to them. The answer to that is yes, but the only record evidence that I'm aware of is from Armando's decision itself of that particular incident. The only record evidence that we have before the Court is flight risk. But we know from our immigration cases where this exact kind of problem has gone into, and with regard to cancellation of removal and other forms of relief, that the, quote, equities, which mean how attached is the person to this country, are widely varied. Yes. Yeah, and I will acknowledge that as counsel. I think that you can. But the same thing, the reason why a person meets a particular crime and they're determined and dangerous despite their roots, they're here. And so it is a tough decision because you obviously have people that meet that criteria. But the record evidence that you have are people committing serious crimes, sometimes heinous crimes, including murder. So even the illegality category, I mean, they may be here illegal, but they have a 90 percent chance of getting relief if they're put into removal proceedings. Yes. Yes. And I think also the way that, again, not practicing the criminal law is that if they were to be convicted, then they're sentenced to time served. So there's not additional time on top of their pretrial incarceration, especially if you're looking at a Class IV felony. But, again, that's not my area of expertise. And if they get acquitted or case is dismissed, then they still have time to do a survey. Then they're acquitted. Yes, sir. Those are all the comments I have. Thank you very much. Let's just put the overtime. The overtime. Thank you very much. Thank you very much. Ms. Wong, why didn't you bring an equal protection claim? Aren't you being here with a class of persons rather than a category of crimes? Because I think that Proposition 100 fails on the Salerno due process test. But you brought lots of other claims as well. I mean, preemption and a host of other things. But you didn't bring an equal protection claim here, did you? That's true. But I did want to address your question about the standard, which also came from Judge Watford and Judge Smith. Narrow tailoring applies on the due process claim. Because Fuchsia versus Louisiana, Andreano versus Flores, both construe Salerno as requiring narrow tailoring. Doesn't that apply only when you find that there's a fundamental right? There is a fundamental. In a due process claim, we don't usually have a three-tier. We usually just do a two-tier. Isn't that correct? Usually, if it's fundamental, then we get strict scrutiny. If it's not fundamental, we get rational basis. And there is no intermediate scrutiny. That's right. I think strict scrutiny applies. And where do you get that out of Salerno? Salerno says that there has to be a compelling governmental interest, which we can see is in place here. And it says that the means chosen by the government to address the governmental interest cannot be excessive. That logically is the same as saying it must be narrowly tailored. And as I said, in Andreano and Fuchsia, the Supreme Court subsequently construed Salerno as requiring narrow tailoring. I do want to address some confusion, I think, coming from the defense position. There are cases that have language in them saying bail is not a fundamental right. All that means is that if a court determines that you're a flight risk and that your flight risk cannot be addressed by conditions of release or by bail, then you can be detained. There can be no doubt that whether or not you should be at liberty when you're merely accusing crimes of fundamental interest. It can't be what it means. There are lots of fundamental interests that nevertheless get abridged by government, First Amendment, religion, all sorts. So when courts say there is no fundamental right, they mean something more than you don't get investigated in this case. Sure. That's right, Judge Kuczynski. But the government has to meet the Salerno test in order to advance liberty. Isn't putting it as to whether bail is a fundamental right slightly off? The question is, is there a fundamental right not to be detained before you've been convicted of a crime without a very good reason? Without it, right. And in this case, without an individualized finding that you present such a great flight risk that no condition of release. But the bail is just a way station as a condition of implementing that. And that is the bail that you say exists to exalt this to strict scrutiny? That's right. To be clear, Reno and Fuchsia, both construe Salerno as requiring narrow tailoring. Now, on the governmental interest side of whatever the standard is, we can see it is a compelling governmental interest to make sure people show up for their trials. But we also have that in intermediate, for example. We have some Second Amendment cases that have come out from our court dealing with important governmental interest. And there's a balancing test that goes on here, whereas strict scrutiny is a far, far more narrow situation. So I'm a little puzzled how you get from intermediate scrutiny to strict scrutiny based upon what you just said. Well, whether or not strict scrutiny applies, we certainly need the heightened standard that applies. But if you don't have strict scrutiny, don't you have a problem with what Judge Bybee was talking about? I'm sorry, Judge? Don't you have a problem? Judge Bybee mentioned that you're either going to have a rational basis or you're going to have strict scrutiny, no intermediate scrutiny, to meet the test. And you were basically saying maybe it's intermediate scrutiny, but we think it's strict scrutiny. If you don't have strict scrutiny, don't you have a problem? I don't think the label strict scrutiny versus intermediate is so important as looking to what the cases that deal with physical liberty instruct. And Salerno, I think, is clear. I'm quoting at page 2103 of 107 of the Supreme Court. We cannot categorically state that pretrial detention offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. Isn't that fatal to your argument that strict scrutiny must apply? Because there is no fundamental right at issue here. I think the language that you're quoting from Salerno is, again, talking about the fact that if a court finds that an individual is not bail worthy, in that case because of dangerousness, there is no fundamental right to be free while you're accused. The principle is clear in Salerno that whatever bail restrictions a legislature chooses, they must not be excessive in relation to the asserted interest. Well, that's been spread out in the Eighth Amendment, isn't it? I think that's the due process standard, Judge O'Scanlan. That's what Salerno instructs. And Reno and Fuchsia are also due process cases, and that's how they construe the standard. I want to pick up on something else Judge Bivey said, and that is that Proposition 100, along with its two copycats in Alabama and Missouri, stands alone among all the bail laws in the United States in singling out for categorical prohibition on bail someone based on an individual characteristic other than a past history of recidivism for that individual. All the other categorical bail prohibitions in the United States, and they are very rare, hinge on the most serious penalties or the most serious violent felonies. And I would add that in Alabama and Missouri there has been a recognition of the constitutional problem. At least one Missouri court has set bail recognizing the problem, and we have that in the record. And Alabama recently, in response to litigation, has recognized the constitutional problem and says that it will set bail because state governments cannot detain based on immigration status. I want to address something that Judge Berzon said quickly, too. You are out of time. Oh, I'm sorry. Thank you. Don't take a minute to respond to Judge Berzon, but do be aware of time. Thank you. Again, the fundamental problem here is that there is no individualized determination of flight risk. But to answer Judge Berzon's question, there are serious procedural defects in this case, and that is relevant under Salerno, which upheld a much less restrictive bail provision based on the presence of those procedural, robust procedural protections. Here we have immigration status determinations made by a list of docket numbers on a Post-it that are taken as 100 percent dispositive. We have testimony that a sheriff's deputy would take 15 to 20 minutes to determine status for 39 defendants. The defendant is not even allowed to see the evidence against him. There's no counsel, and there's no effective appeal because by the time defendants find out about their right to appeal, it's too late because often these people are getting time served or noncustodial sentences. Thank you. Thank you.
judges: Kozinski, O'scannlain, Thomas, McKeown, Fisher, Berzon, Tallman, Bybee, Smith, Nguyen, Watford